THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
VINCENT SPRINGER, Appellant.

Second Department, March 14, 1983

**APPEARANCES OF COUNSEL**

*Axelrod, Cornachio & Famighetti* (*Joseph P. Famighetti* of counsel), for appellant.

*Denis Dillon, District Attorney* (*Anthony J. Girese* and *Denise Parillo* of counsel), for respondent.

**OPINION OF THE COURT**

BROWN, J.

The primary issue on this appeal is whether the People have sustained their burden of demonstrating that the defendant freely and voluntarily consented to the warrantless search of his vehicle by the police. In our view that burden has not been met and, accordingly, the County Court should have granted defendant's motion to suppress and dismissed the indictment.

At about 8:40 P.M. on the evening of December 5, 1980, Police Officer Marc Needleman of the Nassau County

Police Department received a radio transmission declaring that a "stickup" had occurred at a Key Food supermarket in North Valley Stream. One or two minutes thereafter a second transmission described the suspect as a black male with a moustache wearing a long trench coat and a brown ski cap. The radio call gave no information about the suspect's method of escape, nor did it identify the weapon, if any, which was used in the course of the "stickup".

Approaching the supermarket some two to four minutes after the first radio message, Officer Needleman noticed a small red MG, later identified as defendant's car, making a wide turn without slowing down as it exited from the store's parking lot. As Officer Needleman passed by the car which was traveling in the opposite direction, he noticed that the driver was a black male with a moustache and a small goatee. The officer did not observe defendant wearing a hat, nor, from his vantage point, was he able to see the type of coat he was wearing. Recognizing some of the features of the suspect described in the radio transmission, Officer Needleman turned his patrol car around and pulled up behind defendant's car, directing him to stop. After sending a message to other patrol cars for assistance, Officer Needleman approached defendant's car. Defendant willingly exited from his car and obeyed the police officer's direction to remove his hands from his coat pockets. Officer Needleman recalled that defendant was wearing a long brown trench coat. He patted down defendant's coat pockets prior to making any inquiry of defendant and found no weapon or other evidence of criminal activity. Defendant verbally protested the frisk and told Needleman, after the officer mentioned the "stickup" at the Key Food store, that he had been in the supermarket that evening to buy groceries and had not noticed anything unusual. As Officer Needleman and defendant continued their conversation, other police cars arrived at the scene. Needleman estimated that defendant and his car were surrounded by as many as five or six patrol cars containing up to seven or eight officers. Defendant testified that the emergency overhead lights on the patrol cars were flashing.

One of the police officers who arrived to assist Officer Needleman was Officer Stephen King. He parked his pa-

trol car directly in front of defendant's car. Officer King had heard the radio transmission describing the suspect in the "stickup" at the Key Food store but he testified that defendant may have been wearing a plaid jacket that evening, rather than the trench coat mentioned in the description. What transpired between defendant and Officer King is in dispute. Officer King stated that he asked for defendant's permission to search the car and that defendant gave him his verbal assent. Defendant, on the other hand, testified that the officer told him to open the door of his car so that he could search it and that he acquiesced to the search on account of fear, as he was alone and surrounded by many police officers. In any event, Officer King searched defendant's car and found a paper bag containing a loaded revolver beside the driver's seat. Defendant testified that he later voluntarily went to the back of his car to assist other officers in finding the right key to open the trunk of his car.

After being placed under arrest, defendant voluntarily made the statement that he had purchased the gun over 10 years earlier after being the victim of a robbery. Defendant was arraigned and indicted on the weapons charge alone, having been exonerated from any connection with the robbery.

The County Court denied defendant's motion to suppress on the grounds that Officer Needleman had sufficient reasonable suspicion to stop and frisk the defendant and that defendant voluntarily consented to the search of his automobile.

While we agree with the determination that the stop of defendant's automobile and the frisk of the exterior of defendant's coat pockets for weapons constituted reasonable police conduct under the circumstances, we conclude that the revolver found in the car must be suppressed since the prosecution did not sustain its burden of proving that defendant's consent to the search of his automobile was given voluntarily.

Although the description of the suspect which Officer Needleman received over the police radio was somewhat general, the fact that he noticed that defendant resembled

the description in some respects, coupled with the other attendant circumstances, notably the fact that defendant's car was the only vehicle sighted exiting from a parking lot belonging to a supermarket where a "stickup" had recently occurred, provided a sufficient basis for the reasonable suspicion required for an investigatory stop (see CPL 140.50, subd 1; *Terry v Ohio,* 392 US 1; *People v Cantor,* 36 NY2d 106). Officer Needleman's exterior "pat-down" of defendant's coat pockets to discover whether he was armed was a reasonable self-protective measure under the circumstances. The officer was alone on the street at night with an individual who fit some aspects of the description of a suspect in a "stickup", a crime which presumptively involved the use of a dangerous weapon (see CPL 140.50, subd 3; *Terry v Ohio, supra,* p 30; *People v Finlayson,* 76 AD2d 670, 679-680, cert den 450 US 931). Officer Needleman's frisk and subsequent questioning of defendant, however, only served to reduce, rather than increase his level of suspicion. No weapon was discovered during the frisk and defendant gave the officer a completely innocent explanation for his presence at the supermarket, namely that he went there to purchase groceries. Consequently, at that point Officer Needleman did not possess the probable cause to believe that defendant's automobile contained contraband necessary to conduct a warrantless search of that vehicle (see *United States v Ross,* 456 US 798; *Carroll v United States,* 267 US 132). Accordingly, the only legal basis for the search of the defendant's automobile under the circumstances would have been the voluntary consent of the defendant himself (see *Schneckloth v Bustamonte,* 412 US 218, 219; *People v Gonzalez,* 39 NY2d 122, 127).

It is well settled that the People have the heavy burden of proving the voluntariness of a defendant's consent to a search (see *People v Gonzalez, supra,* p 128; *People v Whitehurst,* 25 NY2d 389, 391). In order to sustain this burden, the prosecution must "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied" (*Schneckloth v Bustamonte, supra,* p 248). This standard for voluntariness was further amplified in *People v Gonzalez* (*supra,* p 124), where the Court of Appeals observed: "[o]fficial coercion, even if

deviously subtle, nullifies apparent consent." The voluntariness of a defendant's consent is a question of fact which must be determined from the totality of the circumstances (*Schneckloth v Bustamonte, supra,* pp 248-249; *People v Gonzalez, supra,* pp 128-130; *People v Rivera,* 90 AD2d 778, mot for lv to app granted 58 NY2d 788). In *Gonzalez,* the Court of Appeals discussed various factors which might be considered in determining whether a defendant's consent to a search is voluntary — (1) whether the alleged consent was given when the defendant was in police custody, including such considerations as the number of officers present and the extent to which they physically restrained the defendant; (2) the personal background of the consenter, including his age and prior experience with law enforcement authorities; (3) whether the consenter offered resistance or assistance to the police; and finally (4) whether the police advised the subject of his right to refuse consent. Based upon a consideration of these factors, we conclude that in the instant case the People did not sustain their burden of demonstrating that whatever co-operation defendant offered to the police during the course of the search was "an unequivocal product of an essentially free and unconstrained choice" (*People v Gonzalez, supra,* p 128).

Although defendant was not in custody or under arrest in the traditional sense of those terms, his automobile was blocked on both sides by patrol cars, resulting in a "significant interruption of his liberty of movement as a result of police action" (*People v Cantor,* 36 NY2d 106, 111, *supra*). Defendant was assuredly not free to leave. Although the number of police officers present at the scene does not of itself preclude a voluntary consent, the circumstances surrounding the detention of defendant on the street by a large number of officers were inherently intimidating and coercive. Defendant was not in the relative comfort and security of his own home where he could more easily resist the intrusion of the police. Rather, he was alone on a street at night, surrounded by patrol cars with their overhead lights flashing and a large number of police officers, a situation which afforded him far less control over the course of events. The fact that defendant co-operated with

the police officers by unlatching the door of his car and assisting them in finding the key to the trunk, does not indicate that he consented voluntarily to the search. Whatever co-operation defendant offered to the police can be considered a by-product of the pressures created by his detention on the street and the conduct of the police towards him prior to the search of his automobile, notably the stop of his car and the exterior frisk of his clothing (see *People v Falu,* 85 AD2d 501). With respect to defendant's personal background, he testified that he was a native of the West Indies with only a seventh-grade education. Further, there is nothing in the record to indicate that defendant had ever had any prior experience with law enforcement officers. Although the prosecution need not prove that the subject was aware of his right to refuse consent to the search as a prerequisite to a finding of voluntariness (see *Schneckloth v Bustamonte, supra,* p 249; *People v Gonzalez, supra,* p 130), the failure of the police officers to inform defendant of his right to withhold his consent was an additional factor which negated the validity of the purported consent under these circumstances (*People v Rivera, supra*). Although defendant appeared to co-operate with the police during the search of his automobile, he had earlier protested the frisk of his coat pockets by Officer Needleman, to no avail.

Under the circumstances confronting the defendant in this case when he and his automobile were detained on the street, we are unable to conclude that the People sustained their burden of demonstrating that defendant's apparent consent was freely and voluntarily given, rather than a "capitulation to authority" (*People v Gonzalez, supra,* p 129; *People v Rivera, supra*).

GULOTTA, J. (dissenting). Although otherwise in agreement with my brethren in the majority, it is my belief that the search of the defendant's car in this case was the lawful product of his voluntary consent, and that the judgment appealed from should therefore be affirmed.

Upon defendant being stopped by Officer Needleman on the evening of December 5, 1980, and in response to the latter's call for assistance, four or five additional police cars containing six or seven additional officers soon arrived

at the scene of the detention. Shortly thereafter one of these officers, Stephen King, approached the passenger side of the defendant's vehicle and, according to both officers' testimony, asked the defendant if it would be all right if he (the officer) looked through the defendant's car. At this point, the defendant responded "Fine, go ahead", whereupon Officer King opened the door on the passenger side of the vehicle and began searching the interior. There, beside the driver's seat, and at the bottom of a "crumpled up brown paper bag", the officer discovered the fully loaded revolver which led to the defendant's arrest and conviction. No issue has been raised regarding the ownership of this weapon, which the defendant has freely admitted. Rather, the sole issue presented on this aspect of the case is whether the search of the car leading to the discovery of this weapon was lawful and proper. On this issue, the motion court found, as a fact, that "The search of the automobile, from the credible evidence before the Court, would have appeared to have been accomplished with the consent of the defendant, voluntarily given to the police officers, and the fruits of the search, the .38, or whatever it was that was discovered and seized, was validly seized."

I agree and would therefore affirm.

Although the defendant was admittedly in the presence of several police officers on the night in question, the mere presence of a number of officers at the time that the consent is given is not determinative on the question of its voluntary nature (see *People v Phiefer,* 43 NY2d 719, 721; see, also, *People v Murphy,* 55 NY2d 819, 820). Rather, the number of policemen is only one of the factors to be considered by the court, which is to decide the issue based on the *totality* of the circumstances including the defendant's age and experience, whether he had already been arrested at the time of his purported consent and whether he had ever been advised of his right to withhold his consent to the search (see *People v Gonzalez,* 39 NY2d 122, 128-130; *People v Kuhn,* 33 NY2d 203, 208-209). In this regard, the defendant at bar had not as yet been arrested at the time of Officer King's request (see *People v Gonzalez, supra*), nor is there any testimony which would tend to indicate that he was physically "surrounded" by the other

police officers, as opposed to their merely being present in the area. Moreover, according to the defendant's own testimony, no weapons had been displayed by the police, nor had the defendant, a man of 45, been threatened or harmed or spoken to in a loud or abusive manner. In fact, the defendant was apparently secure enough regarding his personal safety to protest the "frisk" of his person. In addition, while denying that he had ever been asked to consent to the search of his vehicle, the defendant admitted at the suppression hearing that he had *voluntarily* assisted other police officers in opening the trunk of his car, and that he had completely forgotten about the presence of the weapon.

Under these circumstances, and mindful of the admonition that "much weight must be accorded the determination of the suppression court with its peculiar advantages of having seen and heard the witnesses" (*People v Prochilo,* 41 NY2d 759, 761), I am loath to disturb the factual determination of the motion court regarding the voluntary nature of the defendant's consent (see *Schneckloth v Bustamonte,* 412 US 218; *People v Kuhn, supra*), especially where, as here, that finding is fully supported by the credible evidence (see *People v Murphy, supra; People v Phiefer, supra; People v Kuhn, supra*) and is not opposed to the probabilities. On facts such as these, i.e., where a defendant *knows* that he is innocent of the crime under investigation and where he has no reason to believe that there is a weapon or other contraband in the vehicle he is driving, it is not at all difficult to believe that he would voluntarily have consented to a search of that vehicle, if only to assuage the officers' suspicions and shorten the period of his detention (cf. *People v Stepps,* 31 AD2d 59, 62). Moreover, the defendant conceded that he had neither been threatened nor abused, and that he had voluntarily assisted other police officers in opening the trunk of his car.

*People v Falu* (85 AD2d 501) is not to the contrary, as the policemen in that case "had questioned the defendant with regard to the car registration, removed from him a leather pouch which was searched, revealing bullets, had searched the car finding other bullets and marihuana, asked the defendant to step out of the car, and then frisked him", all

*prior* to requesting his permission to open the trunk of the car within which was found the weapon leading to his arrest and conviction for criminal possession of a weapon. Accordingly, the police conduct in *Falu* prior to requesting the defendant's "consent" was far more intrusive than that demonstrated in the case at bar.

For all of these reasons, it is my belief that the search of the defendant's car was lawful, and that the motion to suppress the physical and oral evidence resulting therefrom was properly denied.

MOLLEN, P. J., and BOYERS, J., concur with BROWN, J.; GULOTTA, J., dissents and votes to affirm the judgment, with an opinion.

Judgment of the County Court, Nassau County, rendered October 27, 1981, reversed, on the law and the facts, motion to suppress granted, indictment dismissed and matter remitted to the County Court, Nassau County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.